221 N.J. Super. 420 (1987)
534 A.2d 1025
GULF OIL CORP., PLAINTIFF-APPELLANT,
v.
ACF INDUSTRIES, INC., DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued November 2, 1987.
Decided December 4, 1987.
*421 Before Judges PETRELLA, DREIER and ASHBEY.
Marc Z. Edell argued the cause for appellant (Budd, Larner, Gross, Picillo, Rosenbaum, Greenberg & Sade, attorneys; Marc Z. Edell, of counsel; Cynthia A. Walters, Michael T. Stewart, on the brief).
*422 Michael B. Oropollo argued the cause for respondent (Hoagland, Longo, Oropollo & Moran, attorneys; Michael B. Oropollo, of counsel; Catharine Cookson, on the brief).
The opinion of the court was delivered by DREIER, J.A.D.
Plaintiff Gulf Oil Corp. (Gulf) has appealed from a judgment entered in favor of defendant ACF Industries, Inc. (ACF) by the Law Division. The judgment was alternatively characterized by the trial judge as a summary judgment and a judgment on the pleadings.
Gulf had leased various railroad hopper cars from ACF. In this case Gulf claimed indemnification or contribution from ACF as a result of a judgment against Gulf for injuries to independent workmen occurring when they used a metal ladder to enter one of the cars to clean debris. The ladder came into contact with an overhead electric wire and the plaintiff-workmen suffered severe personal injuries. They sued both Public Service Electric & Gas Company (PSE & G) and Gulf in another action, which was settled in 1984 by judgments against PSE & G in the amount of $4,250,000 and against Gulf in the amount of $825,000.[1]
This complaint was filed in the summer of 1984, and the trial was scheduled to commence March 30, 1987. On March 7, 1987, ACF filed a motion and affidavit on short notice to amend its answer to include a counterclaim for contractual indemnification based upon the lease agreement. Although Gulf opposed the motion, it was granted, the court treating Gulf's opposition to the motion as a motion for summary judgment to dismiss the counterclaim. ACF thereupon filed a cross-motion for summary judgment. One week later the trial judge dismissed the complaint declaring that the operative language of the clause in *423 paragraph 8 (quoted infra), the surrounding circumstances, and the purpose of the clause indicated that the parties intended that ACF would be indemnified from all property damage and personal injury claims arising out of the operation of the hopper car.
On this appeal, Gulf claims that the court misconstrued the clause under New Jersey law,[2] and at the very least, that the clause should have been considered ambiguous and thus subject to factual proof in a plenary hearing concerning the circumstances surrounding the agreement. For a full understanding of the clause in question it must be quoted in context. We, therefore, reproduce not only the operative paragraph 8, but also paragraphs 7, 9, 13 and 15, all dealing with the lessor and lessee's allocation of responsibility for the repair and maintenance of the car.
* * * * * * * *
(7) Lessee will preserve the cars in good condition and will not in any way alter the physical structure of the cars without the approval in writing of the Lessor. At the termination of this lease, Lessee will return all of the cars to the Lessor at the point specified in paragraph (2) hereof, or other points mutually agreed upon, empty, free from residue, and in the same good order and condition as the cars were in when they were delivered by the Lessor to Lessee, ordinary wear and tear excepted. Lessee shall on demand reimburse Lessor for the cost of cleaning any cars containing residue or for damage to any car, appurtenances, and/or outlets which have been affected by the commodity loaded therein.
(8) Lessee will indemnify Lessor against loss or damage caused during the term of this lease to or by any of the cars hereby leased, or to or by the contents thereof, howsoever occurring and will indemnify Lessor against any loss or damage suffered by it by reason of or arising out of any default by Lessee hereunder. Lessee will not assign, transfer, encumber, or otherwise dispose of this lease, the cars or any part thereof or sub-let or under-let the cars hereby leased, or change or permit to be changed or altered the present lettering and/or numbering on said cars or any of them without the consent of Lessor in writing first obtained. Lessee will not permit or suffer any encumbrances or liens to be entered or levied upon the cars, or any of them.

*424 (9) Lessor agrees to furnish the cars in accordance with the present DOT requirements and in compliance with the now existing A.A.R. rules of interchange, and to conduct necessary repairs during the term of this lease. Lessee agrees to provide prompt notification of car damage or defect, and to forward the cars as may be directed by the Lessor. Lessor shall not be liable for any damage to or loss of the whole or any part of any shipment made in any of the cars. Lessee shall at its expense replace any removable parts if lost or broken. If any of the cars shall be completely destroyed, or if the physical condition of any car shall become such that such car cannot be operated in railroad service as determined by the Lessor, then Lessor may at its option cancel this lease as to such car as of the date on which such event occurred, or may substitute therefor another car within a reasonable period of time. Any car modification costs incurred by Lessor in compliance with a DOT or A.A.R. rule change shall be for the account of the Lessee. As cars are placed in a shop for maintenance and/or repair at the direction of Lessor, the rental charges on each such car shall cease on date of arrival at such shop and will be reinstated on date such car is ready to leave such shop to Lessee's specified point. If a car becomes bad order while en route and is placed in railroad shops for repair, then after the lapse of five days the rent on the car so placed shall cease until such car is returned to Lessee's service. If any repairs are required as a result of the misuse by or negligence of Lessee, its consignee, agent or sub-lessee, the rental charge shall continue during the period of repair.
* * * * * * * *
(13) The application, maintenance and removal of interior protective coating on the cars are to be performed by and at the expense of the Lessee. Commodity or mechanical damage to the lining of any car shall be for the account of the Lessee.
* * * * * * * *
(15) Lessee will be responsible for inspection and cleaning of the operating mechanism of the outlets, hatches and special fittings on cars leased herein. Further, any damage to the outlets, hatches and special fittings or their operating mechanism will be repaired for the account of the Lessee. [Emphasis supplied in paragraph 8].
The issues in this case are: (1) whether the term "loss or damage" includes personal injury; (2) whether the indemnification includes a responsibility to pay for injuries caused solely by the negligence of, or a design defect attributable to, the lessor-indemnitee; (3) whether the emphasized clause in paragraph 8 is sufficiently ambiguous to require a plenary hearing on the issue of the parties' intention, and (4) whether the surrounding circumstances of this transaction preclude the indemnification action irrespective of the agreement.
*425 It must be remembered that ACF's motion to add the counterclaim or defense based upon the indemnification provision of paragraph 8 was made on approximately one week's notice, and although each side submitted memoranda and supplemental memoranda as to the law, there was no opportunity for discovery concerning the parties' intention at the time of the contract. ACF's protestation that the matter had been pending for years overlooks the fact that the contract had not been an issue until the 11th hour filing of the counterclaim. We predicate all of our discussions with this observation in mind.

I
The law is clear that through indemnification clauses parties to a contract are free to negotiate the allocation of tort liability regardless of fault. Stier v. Shop Rite of Manalapan, 201 N.J. Super. 142, 150 (App.Div. 1985). Further, the Supreme Court has stated:
Indemnity contracts are interpreted in accordance with the rules governing the construction of contracts generally.... When the meaning of the clause is ambiguous, however, the clause should be strictly construed against the indemnitee. [Ramos v. Browning Ferris Industries, 103 N.J. 177, 191 (1986); citations omitted].
Indemnification clauses in favor of a manufacturer are valid in equipment sales transactions. Berry v. V. Ponte & Sons, 166 N.J. Super. 513, 517-518 (App.Div.), certif. den. 81 N.J. 271 (1979). An all-inclusive indemnity agreement has been held to indemnify a manufacturer even from strict liability claims for latent defects in machinery which proximately cause injuries. Id. at 518-519. We see no reason why such a rule should not be applied in the case of a lease as well as a sale. Cf. Cintrone v. Hertz Truck Leasing & Rental Serv., 45 N.J. 434, 448-449 (1965).
Gulf has alleged that this indemnification for "loss or damage" does not include personal injuries. Further, Gulf contends that in commercial indemnification agreements generally and in the railroad industry in particular, personal injury claims are not encompassed by an indemnification agreement unless such *426 claims are specifically noted. No proof of the existence of such a standard has been offered. The trial judge, however, determined that the words "loss" and "damage" used in the conjunctive evinced an intention to include something more than property damage. He buttressed this argument by reference to the use of the additional words "howsoever occurring." While we have not been able to discover any case that draws the distinction urged by Gulf, we note that Gulf has had no opportunity to show an express understanding that personal injuries were not intended to be included within the broad terms employed by the parties. Although we are remanding this matter for further proceedings, we have determined that, under the rule of law reiterated in Ramos v. Browning Ferris Industries, supra, the clause in question cannot encompass the claims made by ACF. We, therefore, need not here determine whether the terms "loss or damage ... howsoever occurring" include a claim for personal injuries. Compare the terms used in Doloughty v. Blanchard Const. Co., 139 N.J. Super. 110, 118 (Law Div. 1976), with the broad construction also employed in People v. Westchester Colprovia Corporation, 1 A.D.2d 724, 147 N.Y.S.2d 185 (3d Dept. 1955).

II
Our conclusion that the clause in paragraph 8 cannot under Ramos and the cases cited therein protect ACF is based upon the resolution of the question concerning whether the parties specifically agreed that this clause would include indemnification for the indemnitee's negligence. Since indemnification for a latent design defect is the functional equivalent of an indemnification for negligence, Berry v. V. Ponte & Sons, supra, Gulf urges that the clause must be analyzed employing the standards of Doloughty v. Blanchard Const. Co., supra. Doloughty, a prime case for interpreting indemnification agreements, established a two-prong test for analyzing such an agreement. The issue there was

*427 whether it can be fairly concluded from the relevant indicia that the parties contemplated that the indemnitee would be indemnified where by reason of his own negligence he is either solely or concurrently responsible for the injury. [139 N.J. Super. at 116-117].
The first determination to be made was whether the clause falls into the category of a complete indemnification, defined as:
a broad undertaking by an indemnitor to indemnify the indemnitee in respect of any damage or injury which occurs during or in connection with or as a result of the indemnitor's performance of the contracted work. [Id. at 117].
This determination should be made
consistent with what appears to be the intent of the parties, as imposing the exclusive obligation upon the indemnitor ... irrespective of fault and irrespective of the absence of an express undertaking to indemnify the indemnitee for his own negligence. [Ibid].
The prime criterion for determining whether such a broad clause is present is
in essence, work-relatedness without reference at all to the potential or actual common-law liability of either the indemnitor or indemnitee to the claimant. [Ibid].
Since Doloughty involved a construction contract, there is a question whether the concept of "work-relatedness" is sufficiently viable to be extrapolated to the product liability setting.[3] The lease of a railroad car carries with it a different scope of activities than a construction contract. It, therefore, requires a different analysis to determine whether there is all-inclusive language, or whether the second type of indemnity provision discussed in Doloughty would be applicable.[4]
In a product liability setting, if an implied indemnification for the indemnitee's negligence is to be found, language specifically referring to a "defect," such as "in any way caused by any *428 defect in or use of the product" might be the equivalent of the Doloughty "work-relatedness" language for a construction contract.[5] In the case before us, the parties employed the term "howsoever occurring" which could be read either as focusing on the result (through consequential economic damage), or on the cause (by reason of negligence or faulty design, poor maintenance, etc.), or on both, thus creating an ambiguity.
Modifying the language of Doloughty, however, is the strong and more recent reiteration of the indemnification rules applied in a workers' compensation setting by the Supreme Court in Ramos v. Browning Ferris Industries, supra, 103 N.J. at 191-192. There, after stating that an ambiguous indemnification clause[6] must be construed against the indemnitee, Justice Pollock stated:
Thus a contract will not be construed to indemnify the indemnitee against losses resulting from its own negligence unless such an intention is expressed in unequivocal terms. [Citations omitted].
Although Ramos was determined in a different setting, the principle just quoted must be deemed to modify the Doloughty formula which requires that only a broad indemnification for all work-related adverse consequences need be shown *429 for the indemnitor to provide indemnification for the indemnitee's own negligence. Under Ramos and the several cases there cited, there must be language unequivocally including the indemnitee's negligence. We accept for the purpose of this discussion that there need not be any specific mention of the indemnitee's negligence in the contract; sufficient other all-encompassing language specifically mentioning a defect, as noted earlier, and the contractual setting should be able to constitute such an expression in the "unequivocal terms" required by Ramos. It is sufficient for us to say that the clause in question does not on its face satisfy the Ramos criterion.
Of the seven cases cited in Ramos, only one raised a workers' compensation problem. The balance do not. See, e.g., Carbone v. Cortlandt Realty Corp., 58 N.J. 366, 368-369 (1971) (landlord-tenant setting) and George M. Brewster & Son v. Catalytic Const. Co., 17 N.J. 20, 33 (1954) (equipment rental; issue of insurer's liability for indemnitor's responsibility). In Carbone, the clause exculpated a landlord from
any damage or injury to person or property caused by or resulting from steam ... or from any damage or injury resulting or arising from any other cause or happening whatsoever. [Id. 58 N.J. at 368].
In an action against the landlord for damages caused by escaping steam, the Court in Carbone held that the clause did not exculpate the landlord for his own negligence, nor should it "unless the clause expressly so states." Ibid. By citation of these cases in Ramos, the Supreme Court apparently equated landlords' exculpatory clauses, owner-contractor indemnifications, and equipment lessors' indemnification clauses since they all serve similar purposes. 103 N.J. at 192. Measured against this standard, the clause before us must be deemed to fall short of exculpating ACF for its own negligence and, therefore, also for a latent defect caused by a faulty design.[7]

*430 III
As noted earlier, this case had been presented to the trial judge without an adequate factual basis concerning the contract. The contract itself notes that it covers the lease of 40 cars. At oral argument, the parties agreed that the cars had been leased to Gulf after bidding upon Gulf's specifications and that the car in question had in fact been refurbished after the accident without the addition of an internal ladder, and it was so accepted by Gulf. The parties further agreed that approximately 2,000 additional cars built to the same specifications without internal ladders had been leased by Gulf from ACF. Yet Gulf here asserted through an expert that as between this lessor and lessee the car was defective because it had not been constructed with an internal ladder.
We recognize that summary judgment motions are not meant to resolve bona fide issues of fact. Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 73 (1954). Yet on remand, the trial judge should be mindful that in an age of burgeoning product liability cases, summary judgment motions should be scrutinized to determine whether there is a rational basis for a claim. As we stated in Vallillo v. Muskin Corp., 212 N.J. Super. 155, 158 (App.Div. 1986):
[I]n some instances the summary judgment procedure, designed to achieve an inexpensive and expeditious termination of proceedings where there is an insufficient legal basis for recovery, should be utilized. We recognize the financial burden both to plaintiffs and defendants in litigating products liability matters. Both trial and appellate judges should welcome early efforts to review proceedings to determine their legal viability to the end that spurious claims and defenses need not be the subject of extended litigation and its attendant expenditure of resources.
In this case the claim by the injured third parties has already been determined. What might be a product defect in a consumer or injured worker setting is far from such a defect in a case between a lessor and lessee where the lessor has supplied the product to *431 conform to the lessee's specifications and the design has further been ratified by reconditioning and repurchasing (or releasing) the product without change after full knowledge of the alleged defect. Since this issue has not been fully developed at a plenary hearing or even through affidavits, we cannot assume a result on Gulf's claim. Although we must reverse the decision on the contractual indemnification issue, the contribution issue still remains open. The allocation of responsibility for the defect has been finalized with respect to the third parties who were injured, but not between this lessor and lessee. The trial court must still consider both parties' responsibility under the Joint Tortfeasors Contribution Act, N.J.S.A. 2A:53A-1 et seq., and the responsibility of the manufacturer irrespective of an allegation that it followed its customer's specifications. See Michalko v. Cooke Color & Chem. Corp., 91 N.J. 386, 395-397 (1982). If there are still factual issues after examination of appropriate affidavits, a plenary trial may be necessary.
This case, therefore, must be remanded to the Law Division for determinations of issues raised in Gulf's claims. First, was Gulf merely a passive user of a defectively designed product at the time of the accident and thus entitled to common-law indemnification?[8] Such indemnification would only be appropriate if Gulf were a passive tortfeasor and only derivatively responsible for the product. See Anderson v. Somberg, 158 N.J. Super. 384, 397 (App.Div.), certif. den. 77 N.J. 509 (1978). Second, what is the percentage of responsibility of each party under the Joint Tortfeasors Contribution Act, N.J.S.A. 2A:53A-1 et seq., and Comparative Negligence Act, N.J.S.A. 2A:15-5.1 et seq.? See Cartel Capital Corp. v. Fireco of N.J., 81 N.J. 548, 566-567 (1980); Lee's Hawaiian Islanders, Inc. v. Safety First Prod., Inc., 195 N.J. Super. 493, 505 (App.Div.), *432 certif. den. 99 N.J. 205 (1984). Cf. Tefft v. Tefft, 192 N.J. Super. 561, 565 (App.Div. 1983).
The summary judgment in favor of ACF is reversed, and this matter is remanded to the Law Division for a determination of Gulf's claims for common-law indemnification and for contribution.
NOTES
[1] In the case before us, Gulf's expert was to testify that the car had been defectively designed by ACF by reason of the lack of an internal access ladder.
[2] The agreement provided that it was to be construed under the laws of the state of New York; yet the parties agreed in the Law Division and at oral argument before us that the law of the two states is substantially identical.
[3] Since 1981 the construction indemnification area discussed in Doloughty has been governed by statute. See N.J.S.A. 2A:40A-1 et seq., and the legislative history recounted in the Senate and Assembly Committee Statements following N.J.S.A. 2A:40A-1. It thus has been viewed by the Legislature as engendering special indemnification problems.
[4] This second type of indemnity provision is "one which is limited to risk of loss or damage resulting from the negligence or fault of the indemnitor." 139 N.J. Super. at 118.
[5] An example of a broad clause, but which omits specific "defect" language, is found in Berry v. V. Ponte & Sons, supra. The clause there indemnified a

seller from liability `arising from injury or damage to property or person, caused in any manner by the possession, use, or operation' of the machine." [166 N.J. Super. at 516].
[6] In relevant part, the agreement between the parties in Ramos provided that:

Customer [LCA] acknowledges that it has care, custody and management of equipment owned by the Company [BFI] and accepts responsibility for the equipment and its contents except when it is being physically handled by employees of the Company.... Customer expressly agrees to defend, indemnify and hold harmless the Company from and against any and all claims for loss of or damage to property, or injury to or death of person or persons resulting from or arising in any manner out of Customer's use, operation or possession of the equipment furnished under this Agreement. Customer acknowledges that Company shall not be liable for any damage to pavement or driving surface resulting from its trucks servicing an agreed upon area. [Id. 103 N.J. at 182].
[7] While we have construed the clause in our case to fall short of the explicit language required by the rule quoted in Ramos, we also note the implicit limitation of Berry v. V. Ponte & Sons, supra, by this rule insofar as Berry held that broad but non-explicit language concerning causation could encompass an indemnitee's own negligence.
[8] Such a determination could be made only if the representations made at oral argument concerning the participation of Gulf in the specifications for the hopper cars or its knowledgeable acceptance and ratification of the alleged defective design of the car are unsupported by competent proof.